**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 3:26-CR-16** |
| | ) | **JUDGE VARLAN** |
| **REGAN DARBY PRATER** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**
**AND MOTION FOR DOWANWARD VARIANCE**

Defendant Regan Darby Prater, through his undersigned counsel, files this Sentencing Memorandum requesting this Honorable Court to determine a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). The Presentence Investigation Report (hereinafter "PSR") filed in this case calculates an advisory guideline range of 360 months to life, based on a total offense level of 40 and criminal history category of VI. (PSR at ¶ 88). Mr. Prater contends that this guideline range is incorrect and asks the Court to grant his previously filed objections to the PSR. *See* Doc. 12.

The parties have previously entered a FED. R. CRIM. P. Rule 11(c)(1)(C) plea agreement, wherein they agree that a sentence not greater than 240 months is appropriate in this case. [Doc. 2]. Should the Court overrule the PSR Objections, Mr. Prater, alternatively, seeks a downward variance and requests this Honorable Court to sentence him to 120 months of imprisonment. Such a sentence is sufficient but not greater than necessary in light of the factors set out in 18 U.S.C. § 3553(a).

In support thereof, Mr. Prater provides the following:

## I. **Procedural History**

On April 24, 2025, Mr. Prater was taken into custody by the United States Marshals Service pursuant to a writ of habeas corpus *ad prosequendum* for criminal complaint number 3:25-MJ-2093. PSR at p. 2, ¶ 1. Indictment number 3:25-cr-43 was issued on May 7, 2025. *Id.* at ¶ 2. On February 5, 2026, an information was filed in the instant case charging Mr. Prater with malicious use of a fire in violation of 18 U.S.C. § 844(i) and attempted provision of material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1). *Id.* at ¶ 5. On April 13, 2026, Mr. Prater accepted responsibility for his conduct and entered a guilty plea to both counts of the information. *Id*. at ¶ 8. Pursuant to the terms of the parties' written plea agreement, the government agrees to move the Court to dismiss the indictment in docket 3:25-CR-43 at the time of sentencing. *Id*. at ¶ 9.

Upon entry of judgment in this matter, Mr. Prater will return to state custody where he faces pending, unresolved felony charges. *Id*. at ¶ 68. It is worth noting that prior to the instant case, Mr. Prater had completed a 60-month sentence related to his conviction in 4:20-cr-021. *Id*. at ¶ 64. Although he finished the imprisonment part of this sentence, he was not released from custody. But instead, was held on the pending charges in Coffee County, TN. *See* PSR, ¶ 68. He has been in some form of custody continuously since October 29, 2020.

## II. **The Presentence Report and Objections.**

The PSR was released to the parties on August 4, 2026. [Doc. 11]. Mr. Prater, through counsel, filed a Notice of Objections. [Doc. 12]. The objections primarily relate to paragraphs 47 and 49 of the PSR. Paragraph 47 inaccurately adds a 2-level enhancement which alleges the resources provided by Mr. Prater were to be used in a violent act, pursuant to U.S.S.G. §2M5.3(b)(1). Paragraph 49 inaccurately adds a 12-level enhancement, alleging the offense promoted a federal crime of terrorism, pursuant to U.S.S.G. §3A1.4(a). The Government

responded in opposition. [Doc. 14]. Mr. Prater maintains his position on the objections and asks the Court to grant the objections in order to calculate the proper guideline range.

## III. **History and Characteristics of Mr. Prater.**

Regan Prater was the easily forgettable middle child who grew into an angry young man, desperately seeking his community. Mr. Prater was born and raised in a modest home in Coffee County, Tennessee, the son of Shane and Sheryl Prater. His family regularly attended a local church. His father was a retired police officer, and his mother was a stay-at-home mom. Mr. Prater had a slightly older sister, whom he was closer to, and a younger brother. He remembers his parents fighting a lot during his childhood. The young, red-haired, asthmatic boy, who was in the gifted program in school, was often bullied and experienced his own altercations.

During his teenage years, he began consuming alcohol, which escalated to smoking marijuana. He considered suicide at this time in his life. He admitted he was a reckless driver, who did not care about his own safety. Despite his dangerous behavior, he excelled in school, earning a dual-enrollment associate degree in Mechatronics/Industrial Maintenance two weeks prior to earning his high school diploma. After graduation, he held a good job, and at age 19, he bought himself a home, making great strides into true adulthood.

Mr. Prater's life seemed to be coming together, but he lacked a supportive, accepting group of friends. He finally found them in internet chatrooms, where he could be sociable without leaving his home. In the meantime, several events were weighing upon Mr. Prater prior to this incident. His parents knew he was suffering from depression. However, his mother was preoccupied caring for his father who was recovering from colorectal cancer. Simultaneously, his beloved grandmother was in the hospital after suffering a heart attack. Mr. Prater often visited his grandmother during this time, who passed away shortly thereafter. What started as attention-seeking self-sabotage ended up burning his own life down.

Although he is 28 years old now, Mr. Prater was only 21 at the time of the offenses. There is a long history of the consideration of youth as a mitigating factor. The Supreme Court has observed that the lack of a fully formed brain during youth causes inherent recklessness, impulsivity, and irresponsible behavior. *Roper v. Simmons*, 543 U.S. 551, 569-570 (2005). The personality traits of younger defendants are "more transitory, less fixed" than adults, thus reducing the culpability of younger offenders, while increasing the possibility that a youth's character deficiencies can be rehabilitated. *Id*.

Courts in the capital sentencing context have noted that "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982); *see also Johnson v. Texas*, 509 U.S. 350, 367 (1993) ("[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.")

Courts outside the capital context have also recognized that the defendant's age when priors were committed and current age can justify the discretionary use of a downward variance. In *Gall v. United* States, 552 U.S. 38 (2007), the Supreme Court upheld a district court's below-guideline sentence to probation for a drug conspiracy conviction that occurred when the defendant was 21. The Court also considered the fact that the defendant's priors had been committed when he was 18 years old. *Id. at 57-58.* The district judge had relied on studies that suggested the human brain is not fully developed until the age of 25, and that there is no bold line demarcating when a person meets full maturity. *Id. See also United States v. Polito*, 2007 WL 313463, at *356 (5th Cir., Jan. 31, 2007) (unpub.) (18-year-old defendant sentenced to

probation and house arrest for possession of child pornography because his "age and mental condition prohibited him from acting rationally.")

Pursuant to 18 U.S.C. §3353(a)(1), Mr. Prater respectfully requests that this Honorable Court consider his youth and mental health history when determining the appropriate sentence. The American Academy of Pediatrics defines adverse childhood experiences (ACEs)[1] as "stressful or potentially traumatic events that occur before age 18 years and have a negative lasting effect on health and well-being." Sarah Loveday, MBChB, et al, *Screening for Adverse Childhood Experiences in Children: A Systematic Review*, 149 Pediatrics 2, 1 (2022). Sociologist David Finkelhor explains that ACEs "often overwhelm the normal coping resources of a typical child." David Finkelhor, *Trends in Adverse Childhood Experiences (ACEs) in the United States*, 108 Child Abuse and Neglect 1, 2 (2020). ACEs include physical abuse, domestic violence, and parental absence. *Id.* Exposure to ACEs can increase the risk of alcoholism, misuse of prescription drugs, illicit drug use, and depression.[2] The CDC notes that "[t]oxic stress from ACEs can negatively affect children's brain development, immune systems, and stress-response systems. These changes can affect children's attention, decision-making, and learning."[3] Additionally, "cumulative ACEs can begin a journey that results in incarceration if no effective, consistent, and trauma-informed interventions are introduced." Robert H. Strensrud, EdD, *The Childhood to Prison Pipeline: Early Childhood Trauma as Reported by a Prison Population*, 62(4) Rehabilitation Counseling Bulletin 195—208, 206 (2019).

---

[1] The ACEs Questionnaire can be found at: https://www.rockefellerfoundation.org/wp-content/uploads/2021/03/ACE-Questionnaire.pdf. (last reviewed September 28, 2026).
[2] Nerissa Bauer, MD, *Childhood Adversity: Buffering Stress & Building Resilience*, Am. Acad. of Pediatrics (last updated Sept. 28, 2026), https://www.healthychildren.org/English/healthy-living/emotional-wellness/Building-Resilience/Pages/ACEs-Adverse-Childhood-Experiences.aspx.
[3] *Fast Facts: Preventing Adverse Childhood Experiences*, CDC (last reviewed September 28, 2026), https://www.cdc.gov/aces/prevention/index.html.

Courts have recognized that ACEs affect people differently. As one court wrote after reviewing the evidence about a defendant's ACEs, "the neurological effects of the trauma [the defendant] experienced while his brain was still developing likely impacted his capacities to reflect on the consequences of his conduct and to adjust his behavior accordingly, in much the same way that addiction impacts the ability of addicted individuals to avoid illicit substances." *United States v. Carter*, 506 F. Supp. 3d 1204, 1208 (M.D. Ala. 2020). The court recognized in *Carter* that while some people who experience trauma and "receive no mental-health treatment for it are nonetheless able to escape the depression, addictions, and resulting criminal conduct that have characterized [the defendant's] life since his teenage years," the defendant's "culpability for failing to surmount this obstacle is not heightened by the improbable successes of those who do." *Id.* at 1211-12.

A study on ACEs found that "trauma can be disguised as different psychiatric disorders from attention deficit hyperactivity disorder...[or] depression or anxiety disorders...[and] misdiagnosis can easily lead to inappropriate treatments, incomplete interventions, and failed outcomes." Robert H. Strensrud, EdD, *The Childhood to Prison Pipeline: Early Childhood Trauma as Reported by a Prison Population*, 62(4) Rehabilitation Counseling Bulletin 195—208, 206 (2019). Review of Mr. Prater's relevant medical records reveal that he has experienced at least six (6) of the traumatic events scored by ACEs out a possible eleven (11).[4] Research supports the conclusion that what Mr. Prater needs is support and treatment for his dysregulated impulses and addiction, not the further trauma of a lengthy prison term.[5]

---

[4] Mr. Prater's medical records have not been provided with this Memorandum. Should the Court have questions, counsel for Mr. Prater is prepared to provide the records as a whole or a summary prepared after thorough review.

[5] *See* CDC, *Preventing Adverse Childhood Experiences (ACEs): Leveraging the Best Available Evidence* 22 (2019) (describing trauma-informed cognitive behavioral therapy as one evidence-based method for addressing ACE-induced dysregulation); *see also e.g.*, Calif. Dep't of Healthcare Services, ACEs Aware, https://www.acesaware.org/ace-fundamentals/ (last visited September 28, 2026) (recognizing that toxic childhood stress has pernicious and persistent deleterious effects and laying out approaches for treatment and support); Laurie Leitch, *Action steps using ACEs and trauma-informed care: a resilience model*, Health & Just. (Dec. 2017)

Since these offenses in 2019 and his initial term of imprisonment, Mr. Prater has found redemption through the Orthodox Christian church. Specifically, he had become a member of St. Elizabeth Ortohodox Church in Murfreesboro, Tennessee prior to his arrest for the adult store arson. While there, Regan found the since of community that he had been searching for. This community, as opposed to the ones he previously interacted with online, was accepting of him and supportive. One of the church's parishioners wrote a letter on Regan's behalf that details his redemption in faith, companionship, and goodwill towards others. That letter is attached Exhibit A. Mr. Prater continues to share his story and is outspoken about his faith. He believes in the power of forgiveness but understands the pain that he has caused. He continues to struggle with his past and hope for the future.

## IV. **<u>Nature and Circumstances of the offense.</u>**

While Mr. Prater did set fire to the Highlander Research and Education Center (hereinafter "Highlander"), he did so at a time when he knew no one would be occupying the building. The driving factor behind this impulsive, rebellious act is Mr. Prater's desperation to earn the respect and admiration of an online community where he was finally beginning to feel accepted like he never had before. Mr. Prater is deeply remorseful for his actions. At the time of this offense, he had completely succumbed to radical ideology that he found online. For the first time in his life, he had found a community that accepted him and praised his brazen acts. He found the self-worth that he was so desperately seeking in the worst of places.

It is important to note that Mr. Prater committed the arson of Highlander and the arson of the adult store within a couple months of one another. Although they were separate acts, the acts themselves were not separated by arrests. In fact, the phone located at the scene of the adult store

(discussing the trauma-reinforcing effect of the prison environment, which can create a "vicious cycle" for ACE-impaired persons).

arson was the same phone that was re-examined years later and discovered most of the evidence used to prosecute him in the instant cases. Mr. Prater pleaded guilty to the adult store arson and completed his term of imprisonment for that case. Coincidentally, or perhaps not coincidentally, law enforcement moved forward with the instant prosecution as Mr. Prater was preparing for his imminent release.

Also close to this same timeframe in 2019, Mr. Prater shared the document containing personal identifiable information of Mossad agents to another individual that claimed to be associated with Hezbollah. This is not a document that Mr. Prater generated, nor did he confirm any of its content as accurate. The attempt to do so, however, is where Mr. Prater runs afoul. And that very intent is something that fit into his radical ideology at the time. Again, he was praised by the online community.

The simple forwarding of this document, while serious, should be put into context with other individuals that have been prosecuted under 18 U.S.C. § 2339B. The federal criminal code holds an individual equally as accountable for an attempted act as the completed act. Perhaps in some scenarios that is appropriate, but there is a delineation here. Mr. Prater had no idea who he was communicating with when he shared this information. He pulled the document, which was already available on the internet, and forwarded it to this purported representative of Hezbollah. He did not supply money or resources. He did not provide translation services or physical support. He has pleaded guilty to this offense and has accepted responsibility for his role. But his role and actual conduct should be considered by the Court when determining a sentence that is sufficient but not greater than necessary.

## V. **The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment.**

A sentence of 120 months would properly encompass the factors set out in 18 U.S.C. § 3553(a)(2)(A). Mr. Prater understands this is a serious offense and is prepared to serve a significant sentence. Such a sentence endorses the seriousness of the offense and further promotes respect for the law.

The PSR correctly calculates a criminal history score of three. (PSR at ¶ 65). His only prior criminal history is the arson that he committed within months of the instant arson. Despite this, he faces an effective guideline range that is the same for a career offender. But the conduct that is driving the high guideline range is the Attempted Provision of Material Support, not the arson of Highlander. Both are serious, but the arson of Highlander involved much more planning and preparation. It caused immense damage and harm. But without Count 2, Mr. Prater's guideline range is 63-78 months (BOL 24, CHC III).

Instead of an individualized approach to sentencing, the application of §3A1.4(a) lumps Mr. Prater into the highest criminal history category for the least offensive conduct. Using this as a foundation, a sentence of 240 months is not a just sentencing in this case. A sentence of 120 months more adequately addresses the sentencing factors in 18 U.S.C. § 3553(a)(2)(A).

## VI. **The need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from future crimes of Mr. Prater.**

Title 18 U.S.C. § 3553(a)(2)(B) instructs the sentencing court to consider deterrence as a factor in determining a sentence that is "reasonable" for a particular offender. Title 18 U.S.C. § 3553(a)(2)(C) further instructs the sentencing court to consider the need to protect the public from any future crimes of Mr. Prater.

### A. General Deterrence

General deterrence focuses on the need to deter other members of the general public from similar offenses. A sentence of 120 months sends a strong message of retribution to the general public.

### B. Specific Deterrence

Specific deterrence focuses on deterring Mr. Prater from future crimes. Mr. Prater has already served a 60-month sentence for the adult store arson and now faces another significant sentence for conduct that occurred around the same time. Any sentence imposed on the instant case ensures that he is being punished for each specific offense and therefore, specific deterrence would be achieved in this case. A sentence of 120 months properly accounts for both general and specific deterrence as set out in 18 U.S.C. §§ 3553(a)(2)(B) & (C).

## VII. <u>The need for the sentence imposed to provide Mr. Prater with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.</u>

Mr. Prater has several health issues to include a history of kidney stones, ear infections which resulted in hearing loss in his left ear, gall bladder issues, and a family history of colon cancer. Proper medical care and preventative screenings would be beneficial during the duration of his sentence. Mr. Prater also clearly intends to take advantage of programming offered in the Bureau of Prisons, exhibited by spending his presentence incarceration time completing 119 courses and 460 hours of learning. (Exhibit B, EDOVO Transcript).

Mr. Prater has also demonstrated his ability to serve a term of imprisonment effectively and without a significant disciplinary history. (Exhibit C, BOP Class/Work/Disciplinary Transcript). Mr. Prater completed numerous classes within BOP and was successfully a part of several work detail programs. He has also completed multiple drug programs. His only disciplinary occurred in October 2023 when he received a 300-level infraction for disobeying a staff member. This infraction was so minor that it warranted only the loss of commissary for 60 days.

## VIII. **<u>The kinds of sentences available, the applicable category of offense committed by Mr. Prater as set forth in the Guidelines, and the need to avoid unwarranted sentencing disparities among similarly situated defendants.</u>**

The guideline range in the PSR recommends a prison sentence for Mr. Prater. Given his conduct, a significant term of imprisonment is appropriate. But 240 months is greater than necessary, especially when Mr. Prater's conduct is compared to other defendants who were either prosecuted under 18 U.S.C. §2339B and/or received the terrorism enhancement in U.S.S.G. §3A1.4.

Even if the Court decides to overrule the pending PSR objections, numerous grounds exist for the Court to consider a downward variance. None greater than the need to avoid unwarranted sentencing disparities. At least two recent cases from within the district are worth comparison before turning to other districts and circuits.

1. *USA v. Edward Kelley*, 3:22-cr-118. Because the Court also presided over this case, only a brief overview is provided. Mr. Kelley, who was out on pretrial release for his conduct associated with the January 6 riots, conspired with others to murder FBI agents and other law enforcement officials associated with his case. A jury determined that he recruited members, conducted training missions, and had munitions at the ready. This Court concluded that §3A1.4 applied and sentenced Mr. Kelley to life in prison.
2. *USA v. Benjamin Carpenter*, 3:21-cr-38. A jury determined that Mr. Carpenter provided English translations for ISIS propaganda videos. He was charged with one count of Providing Material Support, was found guilty by a jury, and sentenced to 240 months in prison.

For starters, one clear difference between Mr. Prater's case and these two, within-district cases, is that both Kelley and Carpenter went to trial. They both exhibited no acceptance of

responsibility nor remorse for their conduct. In contrast, Mr. Prater has pleaded guilty by Information, absolving the Government of the need to present his case to a grand jury. He has also completely accepted responsibility and is remorseful. A sentence at, or near, the statutory maximum of 240 months provides no incentive for Mr. Prater to have pled guilty and to have saved both the Court's and Government's resources.

Second, Mr. Prater's conduct, compared to both Kelley and Carpenter is milder. For clarity, Mr. Prater is not advocating that his arson of Highlander is mild conduct. It is not. However, the arson guidelines do not control here. Instead, Mr. Prater faces a guideline range more than double what he would if the arson had been the only count of conviction. So, for comparison purposes within this section, Mr. Prater is focused on his conduct as it pertains to attempting to provide material support to a foreign terrorist organization. Mr. Carpenter actually participated with known members of ISIS and furthered their mission to support the organization's propaganda. And he manifested these translations multiple times. Mr. Prater forwarded one document to someone who only posed as a member of Hezbollah. There were no protracted communications nor discussion of further action. Sentencing Mr. Prater to the same sentence as Mr. Carpenter creates the very disparity the guidelines attempt to avoid.

Turning to other districts within the 6th Circuit and the theme seems consistent: sentences are significantly below the statutory maximum, even after conviction at trial:

1. *United States v. Hendricks*, 950 F.3d 348 (6th Cir. 2020) – Mr. Hendricks attempted to recruit various individuals to train and conduct attacks against the United States on behalf of ISIS. After being found guilty at trial, he was sentenced to 180 months.

2. *United States v. Alebbini*, 979 F.3d 537 (6th Cir. 2020) – Mr. Alebbini was arrested as he was attempting to travel to Syria to join ISIS. After being found guilty at a bench trial, he was sentenced 180 months in prison.
3. *United States v. Abdi*, 498 F.Supp. 2d 1048 (S.D. Ohio, 2007) – Mr. Abdi was caught planning to blow up an Ohio shopping mall in support of al Qaeda. He pleaded guilty and was sentenced to 120 months in prison.

Expanding even further out, district courts across the country sentence individuals charged with an offense covered in § 2339B to significantly less than 20 years. Attached to this Memorandum as Exhibit D is a chart created by defense counsel in *United States v. Carpenter* and shared with undersigned counsel in preparation for this memo. The table provides a glimpse into other cases from across the country and notes both the conduct and sentence imposed. Many of them are significantly less than what Mr. Prater is proposing but the conduct as it relates to providing material support is more significant than Mr. Prater's conduct. A sentence of 120 months would fall in line with these cases and prevent a disparity of other similarly situated cases.

Furthermore, the PSR provides relevant information from the JSIN database. *See* PSR, ¶ 113. This data analyzes those defendants that use the same primary guideline section (§2M5.3), final offense level (40), and criminal history score (VI). Even though there were only 7 defendants in the sample size, the median sentence was 168 months. It is worth highlighting again that every individual who receives the enhancement in §3A1.4 automatically is assigned the highest criminal history category irrespective of their actual criminal history score.

## IX. **<u>The need to provide restitution to any victims of the offense</u>**

Restitution in the amount of $1,289,000 has been ordered in this case. *Id*. at ¶ 107-108.

## X. **Conclusion**

In consideration of the foregoing, Regan Prater respectfully submits that a sentence of 120 months, is in accordance with the parties Rule 11(c)(1)(C) plea agreement and is sufficient but not greater than necessary to achieve the sentencing purposes set forth in 18 U.S.C. § 3553(a).

RESPECTFULLY SUBMITTED:

FEDERAL DEFENDER SERVICES OF
EASTERN TENNESSEE, INC.

BY: s/ *G. Nicholas Wallace*
G. Nicholas Wallace
ASB No. 6992D56F
Federal Defender Services
219 West Depot Street, Suite 2
Greeneville, TN 37743
(423) 636-1301